**AFFIRMED as MODIFIED and Opinion Filed June 14, 2021**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-18-01544-CR

**BRANDY NICHOLE CROWE, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 6**
**Dallas County, Texas**
**Trial Court Cause No. F16-34211-X**

## MEMORANDUM OPINION

Before Justices Schenck, Reichek, and Carlyle
Opinion by Justice Reichek

Brandy Nichole Crowe was indicted on a first-degree felony charge of intentionally and knowingly causing serious bodily injury to a child after a five-month-old infant died in her care. Following a bench trial, the trial court found appellant guilty of the lesser included, second-degree felony of reckless injury to a child and assessed punishment at twenty years in prison.

In three issues, appellant argues the evidence is insufficient to support her conviction and the trial court refused to consider the full range of punishment. In a fourth issue, she asks that we correct errors in the judgment. We sustain the fourth

issue and overrule the remaining issues. We modify the judgment to correct the errors and affirm as modified.

## FACTUAL BACKGROUND

In late November 2015, Michelle Razo gave birth to a girl, B.H., who was born three weeks' early but had no complications. Five months later, Razo was looking for child care for B.H. and her sister, four-year-old S.R. By that time, Razo said, B.H. had doubled her birth weight of just under five pounds, could hold her head up, roll over, and sit in her chair. Razo saw appellant's ad on Craigslist: "Openings Available! Irving Mom with paid daycare exp (Irving)." In the ad, appellant said she had experience babysitting children from newborn to 13 years, had previously worked in a daycare center, and had worked "with preemies, deaf children and those with speech/learning difficulties, and multiples." Appellant also said she homeschooled her nine-year-old daughter. Appellant advertised that her prices included all meals and snacks, and she did not charge late fees "[I]f your boss has a nasty habit of keeping you late once in a while."

Razo contacted appellant, talked to her over the phone, and then met with her at appellant's apartment. Appellant told her she had six years' experience in daycare and had "all her certifications" on how to "take care of babies." Razo told appellant that B.H. was born prematurely and was on a special formula for gassiness. Razo said that in appellant, she saw a mother like herself "trying to get by." Although appellant's apartment was not the "cleanest," she thought appellant was struggling

and "figured, from one mother to another," they could help each other. And, importantly, appellant was located near where both she and B.H.'s father, Brian Heppler, lived. Although Heppler was initially reluctant to hire appellant because of the messiness of the apartment, he left the decision to Razo, who decided to try appellant for one week.

Razo took a bassinet/rocker, diapers, and bottles for B.H to appellant's apartment. She also gave appellant phone numbers and email addresses for herself, her stepfather, and Heppler so that if anything happened, appellant would be able to call "right away" so that someone could pick up the children. Appellant was to care for the girls Monday through Friday, 7:30 a.m. to 5:30 p.m. In addition to B.H. and S.R., appellant was caring for another little girl, three-year-old A.J.

Appellant began babysitting B.H. and S.R. the first week of May. During that first week, Razo said only one issue arose: when she arrived one day to pick up B.H. and S.R., B.H. was face down in the bassinet/rocker with a blanket covering the bassinet. Razo described the bassinet as "like a folding-type chair" and said B.H. was "laid funky on it." When Razo questioned appellant about it, appellant explained that the dog was barking and she placed the cover over the bassinet to "drown out" the dog's bark. Razo specifically told appellant not to place B.H. face down again.

At the end of the first week, Razo decided to continue to use appellant, who never indicated to her that B.H. had been fussy. On the following Monday, nothing

unusual happened. On Tuesday, May 10, Razo dropped off B.H. and S.R. at about 7:30 a.m. Appellant told Razo she had watched other children the night before and was tired. Later that day, as Razo was leaving to pick up B.H. and S.R., she received a call from a detective with the Irving Police Department who asked if she was on her way. When Razo arrived at the apartment, appellant was sitting outside with S.R. The detective stopped her and told her there had been an accident and B.H. was dead.

Several witnesses testified about what occurred before Razo arrived. Cadence Copeland, a neighbor of appellant's, arrived that afternoon to pick up A.J. Appellant did not answer his knock at the door right away and then he heard her screaming for him. When he entered the apartment, appellant had B.H. on the floor, "in a panic," saying she did not know what to do. Copeland called 911, and the operator guided appellant in doing chest compressions on B.H.

Irving police officer Gary Fisher was the first officer to arrive at the scene. When he entered the apartment, appellant was performing chest compressions on the baby. Fisher said he told appellant to leave the apartment, and he continued CPR. Fisher said B.H. was rigid, her arms were stiff, and lividity appeared to have already started on her legs. She had no movement or pulse, and Fisher said it was pretty apparent that the baby was dead.

After a few minutes, paramedic Christopher Zmolik arrived, assessed B.H., and determined there was "no possible chance of resuscitation." According to

—4—

Zmolik, the baby's body showed lividity and rigor mortis, which indicated that B.H. had been dead for a while. Zmolik asked appellant about B.H.'s medical history, and appellant told him B.H. was born prematurely, had no serious medical history, but had been dealing with stomach and bowel issues. She told Zmolik that B.H. was having a "crying fit" before she laid her down, and once she got her to sleep, she put the other children in another room so they would not wake her.

Appellant was sitting outside when Irving police Detective Eric Curtis arrived at the scene. After Curtis obtained appellant's consent to search, he went inside the apartment and looked around. The apartment was messy, "very cluttered," and smelled of dog urine. He learned that appellant was running a paid daycare and contacted the state childcare licensing agency, which dispatched a representative to the scene.

Curtis asked to talk to appellant in his police vehicle and audio recorded the conversation. The audio recording was admitted into evidence. Appellant was not under arrest because, as Curtis said, he was "still trying to figure out what we ha[d]." In this interview, which was about one hour after the 911 call, appellant was upset but went through a timeline of the day.

Curtis learned that appellant had four children in the home that day—her own daughter, K.C., as well as B.H., S.R., and A.J. Appellant told Curtis that B.H. was a premature baby, had "fussiness" issues with her formula, and had been fussy since shortly after she fed her between 8 and 8:30 a.m.

Appellant said she put B.H. in her bassinet/swing at about 11:15 a.m. while she made lunch for the older girls. B.H. was fussy, but S.R. and A.J. briefly played with her to stop her crying. After the older girls ate, she put them down for a three-hour nap at about 12:30 p.m. and fixed another bottle for B.H. B.H. slowly took the bottle but started fussing and then "started really fussing." When appellant turned B.H. over onto her tummy in the bassinet/swing, she said B.H. stopped. At that time, appellant laid down on the floor to take a short nap, but B.H. started fussing again and it "got worse." She said she tried feeding her, patting her, and changing her diaper, but B.H. would not stop crying. According to appellant, B.H. was "way, way beyond fussy . . . she was screaming." At that point, appellant said she moved B.H. onto the floor by her. She placed B.H. her on her stomach on a quilt, patted her back, and B.H. "just dropped off" to sleep.

Once B.H. fell asleep, appellant said she checked on her daughter and did the dishes. At about 3:30 p.m., she went to wake S.R. and A.J. from their nap, but they were already awake. A.J. immediately began to complain about a stomach ache and began throwing up. Appellant was dealing with A.J. when, an hour later, she noticed that B.H. was still asleep. About that time, her neighbor, Cadence Copeland, arrived to pick up A.J., and the dog started barking. When the noise did not awaken B.H., appellant thought it was odd and checked on her. Appellant said B.H. was "cold" and her face was red, "but not like it was supposed to be." She screamed for

Copeland and began CPR; Copeland called 911.  During this interview, she never mentioned a pillow.

Curtis asked appellant to do a "walk through" of the apartment to show him how everything happened that day, and appellant agreed.  During this second interview, which was both video and audio recorded, appellant mentioned for the first time using a pillow to help get B.H. to sleep.

Appellant again gave a timeline of the events of the day and explained that she had worked a "really long time" the night before watching three other children.  Appellant said that B.H. got "shrieky" and she laid her on her stomach on a blanket on the floor next to her.  She said B.H. "kind of pushed up" and was "just really ticked off."  Suddenly, she said, B.H. stopped crying, and appellant thought B.H. had passed gas.  She said she left her on the floor because B.H. was so exhausted from crying.

Later in the interview, Curtis asked about a pillow that was on a chair behind the rocker.  Appellant told Curtis she had tossed the pillow onto the chair when she got up from the floor so she would not trip on it.  When Curtis asked her why B.H. had stopped crying so suddenly, appellant said she did not know but that B.H. had "suddenly started taking deeper breaths."  As the interview went on, Curtis asked if appellant had done "something" to the baby out of frustration, and appellant said she did not.  Curtis then explained that an autopsy would show if someone, for example, "used the pillow" on B.H.  Appellant said the "only thing she could think of," and

then paused for several seconds, was that she put the pillow over the bottom half of B.H.'s body. Appellant then demonstrated with a stuffed animal how she placed the pillow on B.H.'s lower body from about mid-back down her legs. She said B.H.'s face was turned to the side. She said she continued to pat B.H., and B.H. "squirmed around for a while" and "kept rubbing her face in the blanket" before suddenly falling asleep. Appellant denied putting the pillow on B.H.'s face or pushing her face into the blanket. When asked why she put B.H. on her stomach, appellant explained that it was a position that helped her own daughter when she was a baby.

The next day, Curtis and another detective interviewed appellant again, this time at the police station. In this interview, appellant recalled how little sleep she had the night before, explaining that she watched children from 6 a.m. Monday to 2 a.m. Tuesday before A.J. arrived about four hours later. B.H. and S.R. arrived about an hour after A.J. As before, she described B.H. as very fussy throughout the day and becoming even more so at about the time she put the girls down for a nap. Although appellant also tried to nap, she was awakened by B.H. fussing. When appellant could not get her to settle down, she put B.H. on her stomach on the blanket on the floor and patted her back. Appellant again recalled how she "kept burying her face in the blanket" and admitted she knew she was not supposed to put a baby face down on such a soft blanket. Appellant said she had "daycare blankets," which were "all flat," and she should have used one of them.

Unlike her version in the second interview where she stayed with B.H. on the floor until she stopped crying, in this interview she admitted that she got up while B.H. was still crying, tossed the pillow on her, and then "walked away." She told Curtis she got tired of "listening to it" and tossed the pillow on B.H. so that B.H. would think she was still there. She demonstrated with a doll how she did it. When she tossed the pillow, B.H. was still "rooting around," screaming, and rubbing her face back and forth into the blanket.

According to appellant, B.H. suddenly stopped crying ten to twenty minutes later. She did not check on her at that point or at any time over the next two to three hours until she found her dead. Although she acknowledged that she should have "gone and looked," she didn't because she was "relieved" B.H. had stopped crying. She said she did not tell the truth initially because she thought it sounded "bad" to leave a crying baby alone on the floor.

Curtis said it was clear from the interviews that appellant had been frustrated that day by B.H.'s fussiness. Further, he said appellant had indicated several times that she knew she should not have put B.H. face down on the blanket. And, he thought it was "odd" that that she did not initially mention the pillow.

Heather Myrick, who supervised investigations into illegal childcare for the Department of Health and Human Services, was called to the scene that day. She interviewed appellant and attended the walk-through interview with Detective Curtis.

Myrick explained the State's licensing requirements and said that because appellant regularly cared for four or more children, she was required to be licensed and registered with the State. Had she been registered, the State would have performed inspections of her apartment, and appellant would have been required to undergo additional training in first aid, infant care, and child development. Appellant, however, was operating without a permit and was previously investigated in 2014 for running an illegal day care. According to Myrick, as part of the 2014 investigation, the State required appellant to obtain a permit and sent her a Child Safety Guide. The guide listed "ways" to "reduce the risk to children" in her care and included instructions on "Safe Sleep." Among other things, the guide instructed caregivers that they should never put an infant to sleep with pillows or blankets, allow anything to cover the infant's face, put an infant on soft bedding, or allow an infant to sleep for extended periods of time without checking on them frequently. The guided further instructed that infants should be put to sleep "alone on their backs in a crib or on another firm surface with tight-fitting bottom sheet" and to "supervise infants closely at all times." Myrick talked to appellant on the night of B.H.'s death, and appellant acknowledged receiving the "Safe Sleep" information previously sent to her.

Appellant gave Myrick a timeline of the day. As she did with Curtis, she recounted for Myrick that B.H. was fussy that day. After putting the older girls down for a nap, she said she fed B.H., who went to sleep from about 1:00 to 1:30 p.m.

–10–

before waking up "shrieking, screaming." When appellant could not calm her, she laid B.H. on her stomach on a quilt on the floor. She told Myrick she patted B.H.'s back and she suddenly stopped crying. Appellant said nothing about the pillow. According to Myrick, appellant said B.H. could not turn over on her own and acknowledged that since her own daughter was a "preemie," she knew she should not have placed B.H. on her stomach.

An autopsy was performed on B.H. the following day. Dr. Jill Urban, a forensic pathologist with the Dallas County Medical Examiner's Office, testified she examined the body and found no external or internal injuries or natural diseases. She did find a small amount of inflammation in her trachea and in her stomach consistent with reflux, which was common for her age. Based on the scene investigation and talking to people involved in the case, Urban concluded that B.H. died of asphyxia in association with an unsafe sleep environment. She explained that asphyxia is used to describe "oxygen not being able to get to the body and into the cells." Here, she said B.H.'s death was "most consistent with a smothering-type death, that is the airways [were] blocked by the bedding."

The State rested after Urban's testimony, and the defense presented no witnesses but moved for an acquittal on first-degree felony injury to a child, arguing the State had not presented anything other than speculation to support an intentional act by appellant that would have caused serious bodily injury to B.H. After hearing arguments, the trial court found the evidence showed beyond a reasonable doubt that

appellant caused serious bodily injury, i.e., the death of B.H., but wanted to review the evidence again before making a decision on the culpable mental state. The court also ordered a presentence report.

When the trial resumed three weeks later, the trial court found appellant guilty of recklessly causing serious bodily injury to a child, a second-degree felony. The court then heard punishment evidence. The only witnesses were B.H.'s parents, who testified about how their daughter's loss had affected them. Both asked for a maximum sentence. At the State's request, the trial court took judicial notice of the presentence report. In argument, the State asked for the maximum sentence while the defense urged the court to consider that this was a "reckless act" and impose a sentence "at the lower end of the range of punishment." After remarking that appellant had shown "no remorse," the trial court assessed a maximum sentence of twenty years in prison. This appeal followed.

## SUFFICIENCY OF EVIDENCE

In reviewing a challenge to the sufficiency of the evidence, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic

–12–

to ultimate facts. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We may not re-evaluate the weight and credibility of the record evidence and thereby substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). However, we must ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged. *Id.*

To sustain a conviction for reckless injury to a child, the evidence must prove the defendant recklessly, by act or omission, caused serious bodily injury to a child fourteen years of age or younger. TEX. PENAL CODE ANN. § 22.04(a)(1), (c)(1). "Serious bodily injury" means bodily injury that creates a serious risk of death or that causes death . . . ." *Id*. § 1.07(46).

Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of the conduct. *Williams*, 235 S.W.3d at 750 (Tex. Crim. App. 2007). A person acts recklessly, or is reckless, when she is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. *Id*. § 6.03(c). The risk created "must be or such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id*. Whether an act involves a substantial and unjustifiable risk "requires an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight."

*Williams*, 235 S.W.3d at 753. "Those who are subjectively aware of a significant danger to life and choose, without justification, to engage in actions (or in some cases inactions) that threaten to bring about that danger have made a calculated decision to gamble with other people's lives." *Id*. at 752 (*quoting* James Gobert, *Searching for Coherence in the Law of Involuntary Manslaughter: The English Experience*, 6 Crim. L.F. 435, 454 (1995)). This combination of awareness of the magnitude of the risk and the conscious disregard for consequences is crucial. *Id*. at 753. Mere lack of foresight, stupidity, irresponsibility, thoughtlessness, and ordinary carelessness do not suffice to constitute criminal recklessness, regardless of how serious the consequences may be. *Id*. at 751.

Culpable mental state is generally proven by circumstantial evidence. *Lopez v. State*, 630 S.W.2d 936, 942 (Tex. Crim. App. 1982). To determine culpability for an offense, a factfinder is entitled to consider events before, during, and after commission of the offense. *Mouton v. State*, 923 S.W.2d 219, 223 (Tex. App.— Houston [14th Dist.] 1996, no pet.). Culpability may be inferred from the acts, words, and conduct of the accused. *Id*. Inconsistent statements made by the accused are probative of wrongful conduct and are circumstances of guilt. *Gear v. State*, 340 S.W.3d 743, 747 (Tex. Crim. App. 2011).

In issues one and two, appellant contends the evidence is legally insufficient to show that she acted recklessly.[1]  She argues that "placing a baby on its stomach" does not amount to reckless behavior, the medical testimony did not support the court's conclusion that she acted recklessly, and her disregard of Razo's "general warning" not to "lay B.H. on her stomach" did not amount to reckless behavior.

The indictment in this case alleged that appellant caused serious bodily injury to B.H., not by placing her on her stomach, but by asphyxiating her with bedding, a pillow, and an unknown object.  By limiting her conduct to placing B.H. on her stomach, appellant ignores other relevant facts.

By her own account, by the time appellant placed B.H. on the floor, B.H. was "way, way beyond fussy" and was "screaming."  Rather than place the upset infant on her back on a thin, daycare-type blanket as she said she knew she should, appellant placed B.H. on her stomach on a soft quilt.  She then tossed a pillow on B.H.'s back as B.H. continued to cry, root around, and rub and bury her face in the blanket.  Then appellant walked away, leaving B.H., who was exhausted from crying, alone on the floor.  When B.H. suddenly stopped crying, appellant was "relieved" and made no effort to check on her.

---

[1] Appellant's second issue challenges the trial court's denial of her motion for directed verdict/motion for acquittal, either of which is reviewed in the same manner as a legal sufficiency challenge.  *See Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996) (motion for directed verdict); *Cuddy v. State*, 107 S.W.3d 92, 94–95 (Tex. App.—Texarkana 2003, no pet.).

Appellant touted herself as an experienced daycare worker who had "all her certifications" on how to "take care of babies" and acknowledged receiving the Safe Sleep guidelines from the State. Those guidelines provided instructions to reduce the very risk to B.H. that appellant created by her actions that day. They instructed appellant to put B.H. to sleep on her back on a firm surface and not to place B.H. on soft bedding, put her to sleep with pillows, or to allow her to sleep for extended periods of time without checking on her frequently. Appellant ignored these warnings as well as Razo's directive, and, according to the medical examiner, B.H. died as a result of asphyxia associated with an "unsafe sleep environment." According to Urban, B.H. was found face down in her bedding and her death was "most consistent with a smothering-type death, that is the airways are blocked by the bedding."

Appellant argues, however, that she did not place B.H. face down and directs us to her interview in which she told the detective that the baby's face was turned to the side after she put the pillow on top of her. But, in the same portion of that interview, appellant also recounted how B.H. "kept rubbing her face in the blanket." Moreover, appellant admitted she walked off and "didn't so much as look at" B.H., who continued to cry for ten to twenty minutes. Given that she did not check on the baby for more than two hours, she could not have known the position of the baby's face after she walked off. She also relies on Razo's testimony that B.H. was able to roll over as proof that she was not reckless. But appellant did not know this; she

–16–

believed B.H. could not roll over. Even assuming B.H. could, under normal circumstances, roll over from front to back or back to front, B.H. had a pillow on her back and was exhausted from crying, both of which would have weakened her.

Finally, we note that appellant lied to police about what happened. Initially, she told the detective that she placed B.H. on the blanket and patted her on the back until she "just dropped off" to sleep. In the second interview, after the detective asked about the pillow, she admitted placing a pillow on B.H.'s back. Again, she said she stayed with her and patted her until she suddenly fell asleep after passing gas. It was not until the third interview that appellant admitted tossing the pillow on B.H.'s back and leaving B.H. to cry for ten to twenty minutes before she suddenly stopped.

Viewing the evidence in the light most favorable to the verdict, the evidence showed that appellant, an experienced childcare provider, knew the dangers associated with placing an infant face down on soft, loose bedding and then leaving her alone for a long period of time in that position. Appellant ignored these risks while at the same time choosing to toss a pillow onto B.H.'s back without once checking on her to see that her airways were not obstructed. The trial court could have rationally concluded that these actions were not mere lack of foresight, stupidity, irresponsibility, thoughtlessness, or ordinary carelessness but were more consistent with a "devil may care" or "not giving a damn" attitude that distinguishes the culpable mental state of recklessness. *See Williams*, 235 S.W.3d at 752–53.

–17–

And, appellant's changing story to the police is further proof that she was aware of the magnitude of the risk she had created.

Given the evidence, the trial court could have rationally concluded that all of appellant's actions relating to position and environment in which she left B.H. combined to create an objectively substantial and unjustifiable risk that the baby would suffocate. We conclude the evidence is sufficient to support appellant's conviction for reckless injury to a child. We overrule the first and second issues.

## NEUTRAL JUDGE

In her third issue, appellant contends the trial judge denied her due process by failing to be neutral and detached in assessing punishment. She argues the trial judge's remarks when pronouncing sentence reflect his bias and unwillingness to consider the full range of punishment, and in particular, probation.

At punishment, Razo testified over objection that appellant should receive the maximum sentence and also testified that appellant had not shown remorse. After hearing punishment testimony, the trial court took judicial notice of the pre-sentencing report and heard counsels' argument before imposing punishment. Appellant complains that the following highlighted remarks, made by the judge sentence when pronouncing sentence, clearly showed the judge's bias:

> Ms. Crowe, I have found you guilty of recklessly causing the death of a child. The punishment range is 2 to 20 years. I've read the pre-sentence report. *I have to agree with mom of the child, I've seen no remorse. I've seen no remorse through your pre-sentence report. You*

*are angry according to the pre-sentence report, even though it was an accident.*

I do not believe you intentionally wanted to harm that child, but your actions actually killed that child. You placed that baby on its face, on its stomach. You've been taking care of children for a long time and you knew better. In your interview you admitted that you knew better. In fact, Michelle had come to pick up her child one time when the baby was on its stomach and *she told you not to do that again, and you did it again. You did it again knowing that the mother didn't want the baby on her stomach.* You did it again knowing through your training and experience that it should not be done.

I'm going to set punishment at 20 years in the Texas Department of Criminal Justice.

A trial court's arbitrary refusal to consider the full range of punishment constitutes a denial of due process. *Grado v. State*, 445 S.W.3d 736, 739 (Tex. Crim. App. 2014). Due process requires the trial court to conduct itself in a neutral and detached way. *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973); *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006). However, absent a clear showing of bias, we presume the trial court's actions were correct. *Brumit*, 206 S.W.3d at 645.

As a general rule, a judge's critical or disapproving remarks to a party will not ordinarily support a bias or partiality challenge unless they reveal an opinion based on extrajudicial information. *Youkers v. State*, 400 S.W.3d 200, 208 (Tex. App.—Dallas 2013, pet. ref'd). Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the proceedings do not constitute bias or impartiality unless the remarks display a deep-seated favoritism or antagonism that would make fair judgment impossible. *Wallace v. State*, No. 05-18-00006-CR,

–19–

2018 WL 6839572, at *3 (Tex. App.—Dallas Dec. 31, 2018, no pet.) (citing *Liteky v. United States*, 510 U.S. 540, 555 (1994)).

Here, the trial judge's comments do not reflect bias or partiality in punishment, and appellant has not shown or otherwise explained why the two highlighted comments reflect bias or failure to consider the full range of punishment. By saying he agreed with B.H.'s mother, the judge was not agreeing with Razo's recommendation of a maximum punishment; rather, the judge was specifically referring to Razo's testimony about appellant's lack of remorse and agreeing that he, too, had not seen any indication of remorse in the pre-sentence report. Appellant does not explain why consideration of a lack of remorse would not be a proper punishment factor. The judge's comment that appellant ignored Razo's instruction to not place B.H. on her stomach was part of his remarks in which he explained that appellant knew not to leave the baby on her stomach. The judge's comments were not based on extra-judicial information but were based on evidence presented at trial.

The record here shows that the judge heard all the evidence before making a decision and made no comment that he was considering less than the full punishment range. In the absence of any indication that the trial court did not consider the full range of punishment, we must presume the trial court was fair and impartial. *See Brumit*, 206 S.W.3d at 645. We conclude that appellant has failed to demonstrate that the trial court arbitrarily refused to consider the full range of punishment before assessing a maximum sentence. We overrule the third issue.

# ERRORS IN JUDGMENT

In her fourth issue, appellant asks the Court to correct errors in the judgment. Specifically, she asserts the judgment incorrectly shows that she was (1) convicted of a first-degree felony and (2) entered an open plea as part of a plea bargain. The record, however, shows that the trial judge convicted appellant of reckless injury to a child, a second-degree felony. The record also shows appellant pleaded not guilty and was not sentenced on an open plea as part of a plea bargain.

We have the power to modify an incorrect judgment to make the record speak the truth when we have the necessary information to do so. *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd).

We sustain appellant's fourth issue. We modify the judgment to correct the errors and affirm the judgment as modified.

/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
181544F.U05

–21–



# Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

BRANDY NICHOLE CROWE,
Appellant

No. 05-18-01544-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District
Court No. 6, Dallas County, Texas
Trial Court Cause No. F16-34211-X.
Opinion delivered by Justice
Reichek; Justices Schenck and
Carlyle participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

To state "Second-Degree Felony" under the heading "Degree of Offense" and to state "None" under heading "Terms of Plea Bargain."

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered June 14, 2021